## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "**Agreement**"), dated as of January 26, 2016, is entered into by and between **MTG Florida LLC**, a Massachusetts limited liability company having a principal address of 224 Calvary Street, Waltham, MA 02453 ("**Buyer**"); **Worldwide Transportation Services, Inc. (Miami)**, a Florida corporation, **Worldwide Limousine Inc.**, a Florida corporation, **Worldwide Investments I, LLC**, a Florida limited liability company, **Worldwide Investments II, LLC**, a Florida limited liability company, **Worldwide Investments III, LLC**, a Florida limited liability company, (collectively the "**Sellers**"), all having a principal address of 14400 NW 77 CT, Suite 200, Miami Lakes, FL 33016 and **Ali A. Malek** the sole stockholder of the Sellers (the "**Sellers' Stockholder**").

WHEREAS, the Sellers operate a chauffeured transportation and destination management business in the Miami metropolitan areas (the "**Business**") from its principal executive office located at 14400 NW 77 CT, Suite 200, Miami Lakes, FL 33016 (the "**Premises**" or "**Business Premises**"); and

WHEREAS, the Buyer desires to purchase substantially all of the assets of the Sellers of all kinds and natures, tangible and intangible, free of all liens and encumbrances, and the Sellers desires to sell, assign and transfer such assets to the Buyer pursuant to sections, 105, 363 and 365 of the Bankruptcy Code and upon the terms and subject to the conditions hereinafter set forth; and

WHEREAS, a prompt consummation of Agreement within 30 days, or within such other time as deemed reasonable by the parties, is vital to ensure the maximization of the value of the Sellers' Bankruptcy Estates and to effectuate the Buyer's goal of maintaining employees and continuing to services the Sellers' contracts as described further herein; and

NOW, THEREFORE, in consideration of the mutual agreements and covenants herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1.
## PURCHASE AND SALE OF ASSETS.

(a)      Purchased Assets.  On the basis of the representations, warranties and understandings set forth in this Agreement, and subject to the terms and conditions set forth herein, at the Closing (as defined below), Sellers agree to sell, transfer, convey, assign and deliver to Buyer free and clear of all mortgages, liens, charges, encumbrances and security interests, and Buyer agrees to purchase from the Sellers, all of Sellers' right, title and interest in, to and under the following assets used in the Business (hereinafter the "**Purchased Assets**" or "**Transferred Assets**"):

(i)      all machinery, furniture, equipment, inventory, tools, spare parts, supplies, materials and other personal property owned by Sellers and either (x) located on the Premises or (y) used in connection with the operation of the Business (the "**Equipment**");

(ii)     all of the Sellers' title to, interest in and rights under the lease of the Business Premises (the "**Premises Lease**") and any personal property leases relating to the Premises or the operation of the Business to which the Sellers is currently a party (the "**Leases**");

(iii)     all of Sellers' rights under the miscellaneous purchase orders, issued by the Sellers in connection with the operation of the Business to the extent outstanding on the Effective Date (the "**Miscellaneous Purchase Orders**");

(iv)     all of the Sellers' title to, interest in and rights under any contracts and agreements relating to operation of the Business to which any of the Sellers is currently a party or under which any of the Sellers will have obligations or liabilities outstanding as of the Effective Date (as defined below) and all other customer contracts, all such contracts referred to in this Section 1(a)(iv) being set forth on Schedule Section 1(a)(iv) (collectively the "**Contracts**");

(v)     all of the Sellers' interest in and rights under the medallions, licenses and permits used by them in the operation of the Business set forth on  Schedule Section 1(a)(v) including, without limitation, those issued by the State of Florida, Miami-Dade county, Florida, Broward county, Florida, and any departments or agencies thereof, and all international and regional airport authorities  (collectively the "**Permits**");

(vi)     selected Vehicles owned or leased by the Seller as determined by the Seller in its sole discretion as follows: within twenty-one (21 days) of the entry of the Bidding Procedures Order, the Buyer will select, in its sole discretion, from the list of vehicles contained in Schedule Section 1(a)(vi), the vehicles or vehicle leases that will be sold, transferred, conveyed, assigned and delivered by the Sellers to the Buyer by this Agreement, subject to the terms of any financing applicable to the selected vehicle or the terms of any applicable vehicle lease (or such other terms or arraignments agreed to by the Buyer and the financing party or lessor with the twenty-one (21 day period)). Any such vehicle selected by the Seller being a "Vehicle" and collectively the "Vehicles." For the avoidance of doubt, the Sellers will retain all rights, title and interest in, and all obligations arising from or related to, any vehicle or vehicle lease that is not selected by the buyer within 21 days of the entry of the Bidding Procedure Order.

(vii)     all of the Sellers' title to, interest in and rights to all computer system hardware currently used in connection with the Business;

(viii)     all of the Sellers' title to, interest in and rights to all computer software used in the Business, together with the rights and subject to the restrictions and requirements set forth in any software licensing agreements to which the Sellers is subject;

(ix)     all of the Sellers' title to, interest in and rights to all trademarks, trade names, internet and world wide web sites, domain names, email addresses and email accounts, including the name "Worldwide Limousine,"  and all other permutations and combinations of this name as used by Sellers in operation of the Business and all other licenses, service marks and registrations and the goodwill and going concern value associated

2

with the Business and all other intellectual property or intangible assets relating to the Business and Sellers of every nature and kind;

        (x)    all of the Sellers' title to, interest in and rights to all current telephone numbers used in the conduct of the Business;

        (xi)    all books and records of the Business; and

        (xii)    any and all other assets owned and used by the Sellers in connection with the Business.

        (b)    <u>Excluded Assets</u>.  The Purchased Assets shall not include the following assets (the "**Excluded Assets**"):

        (i)    any capital stock or equity interests in the Sellers;

        (ii)    the consideration received by the Sellers pursuant to this Agreement;

        (iii)    the rights of the Sellers under this Agreement and such other documents and agreements entered into by Sellers in connection therewith;

        (iv)    all cash and cash equivalents held or owned by Sellers;

        (v)    all accounts receivables and proceeds of accounts receivables;

        (vi)    any and all Plans held or maintained by the Sellers;

        (vii)    all right, title and interest of Sellers in any insurance policies and all rights of Sellers to insurance refunds, reimbursements and other payments under such policies; provided, however, that any proceeds payable under any policy of insurance for any damage to any Transferred Asset(s) for damage arising prior to or on the Effective Date shall not be deemed an Excluded Asset and shall be remitted to Buyer to the extent received by Sellers following the Closing within (5) business days of the receipt of such funds;

        (viii)    any and all assets of Sellers not used in connection with the Business.

**SECTION 2.**
**NO ASSUMPTION OF LIABILITIES**.

Except as provided by <u>Section 1(a)(vi),</u> the payments made by Buyer pursuant to <u>Section 3</u> hereof in consideration of the sale and transfer to Buyer of the Transferred Assets constitutes the total purchase price to be paid for the Transferred Assets, it being expressly understood and agreed that Buyer is not assuming or otherwise becoming obligated for any liabilities or obligations of any kind whatsoever, whether known or unknown, now existing or hereafter arising, fixed, absolute or contingent, direct or indirect, due or becoming due, of any of the Sellers or in any way in connection with, relating to or arising out of the Business or the Transferred Assets, including, without limitation, any Taxes (as that term is defined below), rent payments, amounts due to employees of the Sellers or Business, amounts due to

3

vendors of the Business or any of the Sellers, amounts due to utilities and any and all amounts due to others providing goods or services to Sellers or the Business through the Effective Date or any claims asserting breach of contract, tort, infringement or other violations of federal, state, local, municipal, foreign or other law, statute, rule ordinance or common law by Sellers arising from any facts, events or circumstances occurring on or prior to the Closing Date, in each case, of any kind or nature whatsoever. Accordingly, the Sellers shall remain solely liable for all other liabilities, obligations or claims of any nature of the Business or the Transferred Assets through the Effective Date, including without limitation, any liabilities arising from litigation claims against the Sellers (all such liabilities and obligations not being assumed herein being the "Retained Liabilities").

## SECTION 3.
## PURCHASE PRICE; CLOSING; DELIVERIES; ADJUSTMENT.

(a)      Closing Cash Payment, Deposit and Escrow Amount.

(i)      Subject to terms and conditions hereof and the entry and effectiveness of the Sale Order, the purchase price (the "**Purchase Price**") for the Purchased Assets shall consist of (i) a credit bid of all principal, premium, if any, and interest when and as due, whether at maturity, by acceleration, upon or one or more dates set for prepayment or otherwise, and all monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise of the Sellers under the Loan Agreement dated January 22, 2016 between the Buyer and the Sellers and the DIP Loan Agreement dated January 26, 2016 between the Buyer and the Sellers or any other financing document determined as of the Closing (the "**Credit Bid Amount**") and (ii) the difference between the Credit Bid Amount and ONE MILLION TWO HUNDRED AND FIFTY THOUSAND and 00/100 DOLLARS ($1,250,000.00), less any pre-Closing adjustments pursuant to section 3(a)(i)(1) hereto (the sum being the "**Closing Cash Payment**"), subject to any Post-Closing Adjustments as defined in section 3(a)(i)(1).

(1)      To the extent that it is determined prior to the Closing, the Closing Cash Payment price shall be reduced by (i) the fair market value of any Permit that cannot be transferred to the Buyer at Closing, and (ii) the operational value of any Contract that cannot be transferred to the Buyer at Closing.

(2)      To the extent that it is determined after to the Closing, the Purchase Price shall be reduced by (i) the fair market value of any Permit that cannot be transferred to the Buyer, (ii) the operational value of any Contract that cannot be transferred to the Buyer, and (iii) the value of any Vehicles that cannot be transferred to the Buyer at Closing (the "**Post-Closing Adjustments**"). The reimbursement of the Post Closing Adjustment shall be a superpriority administrative expense priority obligation of Sellers under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Section  503(b) and 507(a) of the Bankruptcy Code, subject only to the super-priority and secured Claims of the DIP Lender under any DIP Order.

4

(b)      Allocation.  The parties agree that the Closing Cash Payment (the "**Total Consideration**") shall be allocated for tax purposes among the Purchased Assets   in accordance with the following methodology (the "**Allocation**"):

| | |
|---|---|
| Property, Vehicles, and Equipment (Class V) | Net book value as of the Effective Date as reflected on the books and records of the Sellers |
| Goodwill, Going Concern Value and Other Code §197 Intangibles (including, without limitation, non-compete covenants, customer-based intangibles, and software and other items of intellectual property) (Classes VI and VII) | Remainder of the Total Consideration |

Sellers and Buyer each hereby covenant and agree that each will prepare and file all tax returns (including IRS Form 8594) in a manner consistent with the Allocation, and will not take a position on any income tax return, before any governmental agency charged with the collection of any income tax, or in any judicial proceeding that is in any way inconsistent with the terms of the agreed upon Allocation.

(c)      Closing.  Subject to the satisfaction or waiver of the conditions set forth in Section 8 below and provided Buyer has not sooner terminated this Agreement in accordance with  Section 9, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place on the date to be determined by Buyer on the fifth (5th) business day following the satisfaction (or due waiver) of the conditions set forth in Section 8 (the "**Closing Date**"); provided, however, that unless this Agreement is sooner terminated, the Closing shall occur not later than April 27, 2016.  The Closing of the purchase and sale of the Transferred Assets shall take place as follows: all documents, instruments, certifications and agreements required to be delivered by Sellers and Buyer hereunder shall be exchanged electronically in portable document format (.pdf) on the Closing Date and become effective at 11:59 pm on the following business day (the "**Effective Date**") with originals (the "**Original Documents**") to be sent via federal express a.m. delivery for receipt on the Effective Date.

(d)      Deliveries by Buyer.  At the Closing, Buyer shall deliver to Sellers the following:

(i)      the Closing Cash Payment, as adjusted in accordance with the terms of this Agreement, payable on the Effective Date and described above in accordance with the terms and conditions set forth in this Agreement;

(ii)      a duly executed Assignment Agreement substantially in the form of Exhibit A attached hereto (the "**Assignment Agreement**");

5

(iii)    a duly executed (A) Warranty Bill of Sale substantially in the form attached hereto as Exhibit B-1 for the Vehicles, and (B) Warranty Bill of Sale substantially in the form attached hereto as Exhibit B-2 for all other Purchased Assets (collectively, the "**Bills of Sale**");

(iv)    a duly executed employment agreement, substantially in the form attached hereto as Exhibit C (the "**Employment Agreement**");

(v)    a duly executed trademark assignment in the form attached hereto as Exhibit D (the "**Trademark Assignment**").

(e)    Deliveries by Sellers:  At the Closing, Sellers shall deliver to Buyer the following:

(i)    the Purchased Assets;

(ii)    a duly executed Assignment Agreement;

(iii)    duly executed Bills of Sale;

(iv)    a duly executed Employment Agreement;

(v)    a duly executed Trademark Assignment;

(vi)    A duly executed limited power of attorney (the "**Limited Power of Attorney**"), in the form attached hereto as Exhibit E;

(vii)    certificates of title duly endorsed to Buyer, or Buyer's designee or assignee, to all the Vehicles, except for those Vehicles subject to vehicle loans, for which duly endorsed titles will be delivered to Buyer within a reasonable period of time following the Effective Date; and

(f)    Additional Deliveries by the Parties; Further Assurances.  The parties shall cooperate in carrying out the intent and purpose of this Agreement, both before and after the Closing, without further consideration, including the execution and delivery of such additional instruments, documents and certificates as may be reasonably requested by the other party that are necessary, appropriate or desirable for the consummation of the transactions contemplated by this Agreement, and such obligation shall survive the Closing. Furthermore, Sellers and Sellers' Stockholder shall cooperate with and assist Buyer in transferring the Permits to Buyer following the Closing which cooperation and assistance shall include, without limitation, execution of any documents and appearance at any hearings required for transfer of the Permits to Buyer.

(g)    Sales and Other Taxes.  Sellers shall pay any and all sales and use taxes imposed or payable on the transfer of the Purchased Assets to Buyer; provided, however, that Buyer will pay, to the extent required, sales tax on the Vehicles to the Florida registry or department of motor vehicles in conjunction with re-titling and re-registering the Vehicles in Buyer's name.

## SECTION 4.
## REPRESENTATIONS AND WARRANTIES OF SELLERS AND SELLERS' STOCKHOLDER.

Sellers, both jointly and severally, hereby represent and warrant to the Buyer that, as of the date of this Agreement and as of the Closing:

(a)    Authority.  Each of the Sellers has the legal capacity, right, power and authority to execute, deliver and perform this Agreement and the other agreements and documents contemplated by this Agreement (all such agreements and documents shall be known herein as the "Transaction Documents" regardless of which party is required to execute or deliver any such agreement or document and such reference shall refer to a document executed by a respective party to whom the reference relates), and to carry out its obligations hereunder and thereunder.

(b)    Approvals.  No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental authority is required in connection with (a) the execution and delivery of this Agreement and the Transaction Documents by the Sellers, (b) the consummation of the transactions contemplated hereby or thereby, or (c) the conduct by the Sellers of its business as it is conducted on the date hereof, the failure of which to obtain would have a material adverse effect on the Business following the Closing.

(c)    Brokers and Finders.  None of the Sellers has employed any broker or finder in connection with the transaction contemplated by this Agreement and no broker or finder is due any fee or commission.

(d)    Organization, etc.  Each of the Sellers is a corporation, duly organized and validly existing under the laws of the State of Florida, and has all requisite corporate right, power and authority to own or lease and to operate its properties and to carry on its business as now being conducted. Each of the Sellers has delivered to the Buyer true, complete and correct copies of the Articles of Incorporation, and all amendments thereto, of the Sellers. There is no jurisdiction where the failure of the Sellers to be qualified or licensed to do business as a foreign corporation in such jurisdiction would have a material adverse effect on the Sellers or its business now being conducted.

(e)    Financial Statements.   The Sellers have delivered to the Buyer true, complete and correct copies of the Sellers' audited balance sheet and profit and loss statement for the years ended December 31, 2013 and 2014 and 2015 (collectively the "**Sellers Financial Statements**"). The Sellers Financial Statements, to be delivered to the Buyer pursuant to this Agreement when so delivered are true, correct and complete in all material respects, are in accordance with the books and records of the Sellers, have been prepared in accordance with GAAP consistently applied throughout the periods indicated, and present fairly in all material respects the financial position of each of the Sellers for the dates indicated and the results of operations for the periods indicated.

(f)     <u>Absence of Certain Changes</u>.  Since January 1, 2015 there have been no material adverse changes in the assets, liabilities, properties, Business or condition (financial or otherwise) of any of the Sellers.

(g)     <u>Tax Returns, Taxes</u>.  Each of the Sellers has filed with the appropriate governmental agencies all tax returns and reports, including but not limited to reports of corporate tax, income taxes, withholding and employment taxes, sales and use taxes, consumption taxes, property, payroll, ad valorem, value added and other taxes, assessments, fees, levies or governmental charges (collectively, "**Taxes**"), required to be filed in connection with or affecting the Sellers or its Business or operation, and have paid the Taxes shown on the returns or otherwise assessed, levied and due and payable by any of the Sellers, including related penalties and/or interest.  Each of the Sellers has collected or withheld and paid over, when due, all material employment and withholding taxes required to be paid over by it to, or deposited by it with, all appropriate taxing authorities.  The term "Taxes" includes taxes or levies of whatsoever nature imposed by any federal, state or municipal government, or departments or instrumentalities thereof.

(h)     <u>Non-Contravention</u>.  The execution and delivery of this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby will not (a) violate any provision of the Articles of Incorporation or By-Laws of any of the Sellers, (b) violate any material provision of, or result in the breach or the acceleration of, or entitle any party to accelerate (whether after the giving of notice or lapse of time or both), any material obligation under, any note, bond, indenture, deed of trust, contract, agreement, commitment, arrangement, mortgage, lien, lease, agreement, license, instrument, order, arbitration award, judgment or decree to which any of the Sellers is a party or by which any of the Sellers is bound, (c) result in the creation or imposition of any material lien upon any property of any of the Sellers or (d) violate or conflict with any other material restriction or any law, statute, regulation, ordinance, decree, judgment or rule to which any of the Sellers or any property of any of the Sellers is subject, in a manner which would have a material adverse effect on any of the Sellers or the Business.

(i)     <u>Title to and Condition of the Purchased Assets</u>.

(i)     Each of the Sellers has good title to all assets owned by it, free and clear of all liens.  The property and assets reflected in the Sellers Financial Statements or acquired after the dates of such financial statements, constitute all of the material tangible assets and properties that any of the Sellers own, in connection with its Business, and the conduct of such Business as a going concern and, except for additions or dispositions in the ordinary course of business, include, together with any tangible assets and tangible properties leased or licensed to the Sellers, all material tangible assets and tangible properties used in such Business as being presently conducted.

(ii)     The facilities, Vehicles, machinery, furniture, office and other equipment of the Sellers that are used in its Business are in sufficient operating condition and repair to run the Business as currently conducted by Sellers, subject only to ordinary wear and tear, and are useable in the Business as currently conducted by the Sellers.  Neither the Sellers nor any property or asset owned or leased by any of them is in violation of any

8

applicable ordinance, regulation or building, zoning, environmental or other law, the violation of which would have a material adverse effect on the financial condition, the conduct of the Business of the Sellers or the ownership or use of any of the properties or assets of or by the Sellers.

       (iii)    Each lease pursuant to which any of the Sellers leases any personal property is in full force and effect and is valid and enforceable in accordance with its terms and none of the Sellers have received notice that any person has claimed or claims otherwise. To the Sellers' knowledge, there is not under any such lease any material default by any other party thereto or any event that with notice or lapse of time or both would constitute such a material default thereunder by such party.

      (j)    <u>Litigation</u>.

       (i)    Except as otherwise set forth on <u>Schedule Section 4(j)(i)</u>, there are no actions, suits, proceedings, investigations or inquiries pending or, to Sellers' knowledge, threatened against the Sellers or the Business in any court or before any federal, state or other governmental department, commission, board, bureau or agency.

       (ii)    The Sellers is not in default in respect of any judgment, order, writ, injunction or decree of any court or any federal, state or other governmental department, commission, board, bureau or agency.

      (k)    <u>Employee Benefit Plans and Other Arrangements</u>.  (a) Except as set forth on <u>Schedule Section 4(k)</u> attached hereto and made a part hereof, the Sellers does not maintain or make any contributions to, and has not been obligated by law or agreement to establish, maintain, sponsor or make any contributions to (i) any employee pension benefit plan as described in Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended, and regulations thereunder ("ERISA"), (ii) any employee welfare benefit plan as described in Section 3(1) of ERISA, including, without limitation, any arrangement providing for the payment of health benefits to former employees or their beneficiaries, (iii) any formal or informal severance plan or arrangement, including, without limitation, any arrangement providing for payments to be made to any person contingent upon a change of ownership or effective control of the Sellers or ownership of a substantial portion of the assets of the Sellers, or (iv) any other deferred compensation, bonus, stock option, stock purchase, revenue sharing, insurance, or other employee benefit plan, agreement, fund, or arrangement, whether or not set forth in writing, providing benefits of economic value to any employee, former employee or present or former beneficiary, dependent or assignee, other than regular salary, wages or commissions paid substantially concurrently with the performance of the services for which they are paid (individually or collectively referred to as "Plan" or "Plans") for which Buyer could be liable.  The Seller has made (or will make) on a timely basis all contributions or payments required (if any) in respect of each Plan prior to the Closing Date.    Neither the Seller nor any member of the Seller's controlled group (within the meaning of Section 4001 of ERISA) has incurred (or reasonably expects to incur) any material liability to the Pension Benefit Guaranty Corporation or any material liability under Title IV of ERISA, and there are no circumstances that might result in the imposition of a Lien on any of the assets of the Seller pursuant to ERISA Sections 302 or 4068 or

Section 412 of the Internal Revenue Code of 1986, as amended (the "**Code**"). The Seller has maintained each Plan according to and in compliance with applicable law without any violation thereof. There are no suits or other proceedings pending or, to the best of the Seller's knowledge, after due inquiry, threatened, by present or former employees of the Seller, Plan participants, beneficiaries or spouses of any of the above, or any other person or entity involving any Plan or any rights or benefits thereunder.

      (l)      <u>Contracts</u>.

      (i)      The Buyer has been given access to true, correct and complete copies of all agreements, contracts and commitments to which the Sellers is a party or by which it or any of its assets is bound, the terms of which involve payments, receipts or potential obligations or liabilities by or of the Sellers of more than Five Thousand Dollars ($5,000), as of the date of this Agreement, in a given year (collectively, the "**Seller Contracts**"), together with all amendments and side letters thereto. The Seller Contracts are valid, binding and in full force and effect (as to third parties, to the knowledge of Sellers) and enforceable by the Sellers in accordance with their terms, and to Sellers' knowledge, all parties to the Seller Contracts have, in all material respects, performed all obligations required to be performed by them to date. Neither the Sellers nor any other party is in material default thereunder (other than customers who are overdue in payments to the Sellers, which overdue payments are not, in the aggregate, material in amount).

      (m)      <u>Compliance with Laws, etc</u>. The Sellers has materially complied with and is in material compliance with all federal, state and local statutes, laws, ordinances, regulations, rules, permits, judgments, orders or decrees applicable to it or any of its properties, assets, operations and business, and there does not exist any basis for any claim of default under or violation of any such statute, law, ordinance, regulation, rule, permit, judgment, order or decree, where the failure to be in compliance or where the claim of default would have a material adverse effect on the Sellers or its Business. All Permits have been duly issued and are in full force and effect and such Permits and Sellers are in good standing with all applicable issuing authorities.

      (n)      <u>No Undisclosed Liabilities, Etc</u>.

      (i)      The Sellers has not incurred any material liability or obligation (absolute, accrued, contingent or otherwise) of a nature that is to be set forth on GAAP financial statements that has not been properly reflected or reserved against in the Sellers Financial Statements.

      (o)      <u>Environmental Matters</u>.

      (i)      No material releases or material threat of releases of hazardous substances have occurred at, from, in or on the Business Premises or any real property owned, leased or operated by the Sellers at any time (each a "**Site**") in violation of any environmental laws, during Sellers' occupation of such Sites;

      (ii)      There are no material past or pending environmental claims against the Sellers related to any Site. To Sellers' knowledge, there has been no violation of or non-

compliance with any environmental law or environmental permit by the Sellers relating to operations or other uses by the Sellers of any Site where a violation or the failure to be in compliance would have a material adverse effect on the Sellers or its Business.

(iii)   There are no underground or above-ground gasoline, diesel fuel or waste-oil storage tanks on the Business Premises.

(p)   Employee and Related Matters.   Schedule Section 4(p) attached hereto contains a list of the name, title, date of hire and current monthly compensation, base salary or hourly remuneration rate of each person employed by the Sellers as of the date of this Agreement (including persons employed as trainees), together with a statement of the full amount and nature of any other remuneration, whether in cash or kind, paid to each such person since December 31, 2014.   Sellers are not in violation of any law dealing with employment matters.   As of the Closing, the Sellers will not have outstanding material liability for any unpaid wages, overtime pay, vacation pay, bonuses, or commissions, or for any material Tax, penalty, assessment or forfeiture for failure to comply with any employer/employee matter, all of which will have been paid and satisfied by Sellers in full on or before the Closing Date.   There are no strikes, lockouts, work stoppages, slowdowns, material arbitrations or, to the knowledge of Sellers, material grievances or organizing activities occurring or threatened with respect to the Sellers.   Sellers is not a party to any collective bargaining agreement.   Sellers does not engage, and has not engaged during the last five (5) years, any person as an independent contractor to perform any services for or on behalf of the Sellers or the Business, except as set forth on Schedule Section 4(p).

(q)   Intellectual Property.   To Sellers' knowledge, Sellers is the sole and exclusive owner of all trademarks, trade names, service marks, copyrights, with state and federal registration numbers (if applicable) (the "**Trade Names and Rights**") utilized by Sellers in connection with the Business or operation of the Business.   To Sellers' knowledge, Sellers has the sole and exclusive rights to use the Trade Names and Rights and all such rights are free and clear of any liens, encumbrances, equities, claims and obligations to other persons, of whatever kind or character other than Permitted Encumbrances.   There are no claims or demands of any other person, firm, corporation or entity pertaining to any such rights; and to Sellers' knowledge, no proceedings have been instituted, are pending or are threatened which challenge any of the rights of the Sellers in respect thereto.   To Sellers' knowledge, none of the Trade Names and Rights infringe on or otherwise violate the rights of others or are being infringed on by others and none are subjected to any outstanding order, decree, judgment or stipulation.   No licenses, sub-licenses or agreements pertaining to any such trademarks, trade names, service marks, copyrights or renewals are in effect.   Sellers has not, during the past three (3) years, been formally charged with infringement of any adversely-held copyright, trademark, service mark, trade name or patent used in connection with the Business or operation of the Business.

(r)   Disclosure.   No representation or warranty by the Sellers and Sellers' Stockholder in this Agreement or any Transaction Document and no statement contained in any exhibit, list, certificate, document or schedule delivered or to be delivered pursuant to this Agreement or the Transaction Documents, contains or will contain any untrue statement of a material fact or omits or will omit any material fact necessary in order to make the

11

statements contained therein in light of the circumstances under which they were made not misleading.  The Sellers' Stockholder has caused the Sellers to disclose, and the Sellers have disclosed to the Buyer, all facts pertaining to the transactions contemplated by this Agreement which the Sellers believes to be material.

## SECTION 5.
## REPRESENTATIONS AND WARRANTIES OF BUYER.

Buyer hereby represents and warrants to the Sellers that, as of the date of this Agreement and as of the Closing:

(a)    Organization; Power.  Buyer is a duly organized and validly existing limited liability company in good standing under the laws of the Commonwealth of Massachusetts. Buyer has all requisite limited liability company power and authority to carry on its business as it has been and currently is being conducted, to own, lease and operate the properties and assets used in connection therewith, to execute, deliver and perform this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.

(b)    Authority.   The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary limited liability company action on the part of Buyer, and this Agreement and the other Transaction Documents to which Buyer is a party are the valid and binding obligations of Buyer enforceable in accordance with their terms.

(c)    Non-Contravention.  Neither the execution and delivery by Buyer of this Agreement or any other Transaction Documents to which it is a party nor the consummation or performance by Buyer of any of the transactions contemplated hereby and thereby will contravene, conflict with or result in any violation by Buyer under any provisions of or result in acceleration, termination, cancellation or modification of, or constitute a default under:

(i)    the certificate of organization, operating agreement or similar governing documents of Buyer;

(ii)    any applicable law, rule or regulation; or

(iii)    any contract, lease or other instrument to which a Buyer is now a party.

(d)    Brokers and Finders.  Buyer has not employed any broker or finder in connection with the transaction contemplated by this Agreement and no broker or finder is due any fee or commission.

## SECTION 6.
## POST-CLOSING PRESERVATION OF GOODWILL OF THE BUSINESS BY SELLERS AND SELLERS' STOCKHOLDER.

12

In consideration of the Buyer entering into this Agreement and the purchase of the Transferred Assets and goodwill of the Business from the Sellers and Sellers' Stockholder (each a "**Seller-Party**" and collectively, the "**Seller-Parties**"), the Seller-Parties agree that, while employed with the Buyer as an employee, consultant, independent contractor or otherwise and for a period equal to five (5) years following the Effective Date or the longest period of time allowed under Florida law, whichever is shorter, they shall not:

(a)     directly or indirectly, engage in, own, control, or make a significant non-controlling investment in, any business that competes directly with the Business or the Buyer within Illinois, New York, New Jersey, Pennsylvania, Florida, Maine, Vermont, New Hampshire, Massachusetts, Connecticut, Rhode Island, Maryland, Virginia, Delaware, the District of Columbia, North Carolina or any other state in which Buyer hereafter establishes offices or other facilities (the "**Market**"); provided, however, that nothing in this Section 6 shall prohibit the Sellers Parties from owning less than five percent (5%) of the outstanding securities of a corporation which is publicly traded on a securities exchange or over-the-counter;

(b)     accept employment with any person or entity that competes directly with the Business, the Buyer or any affiliate thereof within the Market;

(c)     directly or indirectly solicit or employ any person who at such time provides services for or is otherwise employed by the Business, the Buyer or any affiliate thereof, or encourage or induce any employee of the Business, the Buyer or any affiliate thereof to leave such employment other than any employee terminated by Buyer who has not been employed by Buyer or Sellers for six (6) months; or

(d)     directly or indirectly, divert or attempt to divert from the Business, the Buyer or any affiliate thereof the business of any current or then-current customer or client of the Business or the Buyer;

(e)     divulge or disclose to others or make any use, direct or indirect, of any confidential, proprietary or secret information obtained by a Sellers-Party as a result of his operation of the Business, including but not limited to (A) lists of customers or prospective customers, vendors, suppliers, or employees, (B) any inventions, developments, specifications, technical and /or engineering data, methods or reports related to the Business and Buyer, and (C) all other Confidential Information, as defined hereafter, of the Business. The term "**Confidential Information**" as used in this Section 6(e) shall mean all trade secrets, proprietary information and other data or information (and any tangible evidence, record or representation thereof), whether prepared, conceived or developed by Sellers or an employee of the Sellers or received by the Sellers from an outside source, which is in the possession of the Sellers (whether or not the property of Sellers) which in any way relates to the present or future Business or the Buyer. Without limiting the generality of the foregoing, Confidential Information shall include the identity and location of any customer, and any other customer information including, without limitation, customer pricing, customer purchase information and history, customer purchase patterns and tendencies, customer needs, requirements and preferences, the identity or location of any supplier, vendor, employee, sales agent or consultant, any sales plan, marketing material, plan, survey,

13

business plan or opportunity, product or service development plan or specification, business proposal, financial record or report, business record or service development plan or specification, business record, financial record or report, price list, sales leads, or any litigation or potential litigation or business or legal dispute or any business record or other record or information relating to the present or proposed Business or present or proposed business of any customer.

(f)       Each of the Seller-Parties expressly acknowledges that any breach or threatened breach of any of the terms or conditions or covenants set forth in this <u>Section 6</u> will result in substantial, continuing and irreparable injury to the Buyer and that the remedy of the Buyer at law for any such breach or threatened breach would be inadequate. Therefore, each Sellers-Party agrees that, in addition to any other remedy that may be available to the Buyer under the terms of this Agreement or under applicable law, the Buyer shall be entitled to seek and each Seller-Party shall not oppose, a request for injunctive or other equitable relief by a court of appropriate jurisdiction. Each Seller-Party further agrees that in the event of any obtained final judgment for breach of any of the terms or conditions and/or covenants set forth in this Agreement determined in favor of Buyer, in addition to any other remedy that may be available to the Buyer under the terms of this Agreement or under applicable law, the Seller-Parties shall pay the Buyer all costs and expenses incurred by the Buyer in enforcing the provisions of this <u>Section 6</u>, including the Buyer's reasonable and necessary attorneys' fees and costs.

**SECTION 7.**
**<u>PRE-CLOSING COVENANTS OF SELLERS</u>**.

Sellers covenant and agree that:

(a)       From the date of this Agreement until the Closing Date, each Seller shall, with respect to the Business, (i) carry on the Business in substantially the same manner as it has heretofore, (ii) not make any material change in personnel, operations, finance or accounting policies with respect to any of the Purchased Assets, (iii) perform its obligations under the Contracts, (iv) comply in all materials respects with all relevant federal, state, local, municipal, statute, rule ordinance or other law, and (v) to the extent applicable, renew any Permit, or take other such appropriate steps to preserve the value of effectiveness of the Permits.

(b)       Prior to the Closing, the Seller shall afford to the Buyer and to the Buyer's designated representatives unfettered access, during normal business hours, to all Business Premises and to all non-privileged records, books, contracts, instruments, documents, correspondence, computer data and other data and information within the possession or control of the Seller relating to the Business and make available to the Buyer and to the Buyer's designated representatives unfettered access,  the Sellers party's officers, directors, employees and agents for matters relating to the Business.

(c)       Effective immediately prior to the Closing, the Sellers shall terminate the employment of each of its employees, and Buyer shall offer employment effective at the Effective Date to such employees as Buyer seeks to employ, at Buyer's sole discretion. The

14

Sellers consents to the hiring of such employees by the Buyer and waives, with respect to the employment by the Buyer of such employees, any claims or rights that the Sellers may have against the Buyer or any such employee under any non-competition, confidentiality or employment agreement.

(d)    On the Effective Date, Sellers will have good and marketable title to any property that, in the ordinary course of business, has replaced any tangible personal property generally referred to as fixed assets or property, plant and equipment since the date of this Agreement, free and clear of all liens, claims, security interests or encumbrances, except for Permitted Encumbrances.

(e)    On the Effective Date, all Transferred Assets shall be in substantially the same condition, reasonable wear and tear excepted, as they were on the date of this Agreement and shall be in sufficient operating condition and merchantable.

(f)    Between the date of this Agreement and the Closing Date, to the extent permitted by Law, Sellers shall provide Buyer and its representatives (i) access, during normal business hours and upon reasonable prior notice, to and the right to inspect vehicles, properties (including the Real Property), any leased property, books and records, and other documents and information relating to the Purchased Assets, and (ii) access, during normal business hours and upon reasonable prior notice, to Sellers' employees, and shall furnish Buyer and its representatives with such additional financial and operating data and other information of Sellers and possession, custody or control relating to the Purchased Assets as Buyer or its representatives may from time to time reasonably request.

(g)    Within two (2) days of the full execution of this Agreement, Sellers shall file a motion with the Bankruptcy Court (the "**Bidding Procedures Motion**") seeking to approve the Bidding Procedures attached hereto as Exhibit F, the form and substance of which shall be mutually acceptable to the Buyer and Sellers (the "**Bidding Procedures**"), which shall govern the terms and conditions of Qualified Bids (as such term is defined in the Bidding Procedures) and of the sale and the Auction (as such term is defined in the Bidding Procedures). Sellers shall use commercially reasonable efforts to obtain entry of an Order in the form set forth in Exhibit G, the form and substance of which shall be mutually acceptable to the Buyer and Sellers (the "**Bidding Procedures Order**") granting such Bidding Procedures Motion on or before February 1, 2016. The Bidding Procedures and the Bidding Procedures Order shall provide for, among other things:

(i)    That Qualified Bids shall include terms and consideration of a value consistent with, but not less than, the terms and consideration set forth in this Agreement, plus:

(1)    The Break-Up Fee (as such term is defined in the Bidding Procedures);

(2)    an initial overbid of $100,000.

(ii)    that the cash portion of any successive overbids shall be made in increments not less than $100,000 in excess of the last submitted, highest Qualified Bid for the Purchased Assets;

(iii)    that a Qualified Bid contains terms and conditions as they relate to the Sellers that are higher or better than the terms and conditions set forth in this Agreement;

(iv)    for any Person submitting a Qualified Bid to provide a Good Faith Deposit (as such term is defined in the Bidding Procedures) equal to ten percent (10%) of the amount of the Qualified Bid; and

(v)    that the Break-Up Fee shall be payable to Buyer from the cash proceeds of an Alternate Transaction, subject to the terms of this Agreement.

(h)    Sellers shall use commercially reasonable efforts to obtain, through the filing with the Bankruptcy Court for the Southern District of Florida (the "**Bankruptcy Court**") of appropriate applications or motions (the "**Sale Motion**"), approval of the "**Sale Order**", in the form set forth in Exhibit H, not later than two (2) Business Days after conclusion of the Auction, and entry of the Sale Order, not later than five (5) Business Days after conclusion of the Auction.

(i)    Sellers shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion and Sale Motion to all creditors and parties in interest entitled to notice pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local rules of the Bankruptcy Court, and orders of the Bankruptcy Court, other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby.

(j)    Within twenty-one (21) days following entry of the Bidding Procedures Order, the Sellers will serve a cure notice (the "**Cure Notice**") and thither agreed documentation providing notice of the Sale Order, by first class mail, overnight or electronic mail on all non-debtor counterparties to Contracts, the Premise Lease and any lease or other financing document related to a Vehicle. The Cure Notice will inform each recipient that its respective contract or lease may be either assumed or rejected, and the timing and procedures relating to such assumption or rejection, and, to the extent applicable (i) the title of the contract or lease, (ii) the name of the counterparty to the contract or lease, (iii) the Sellers' good faith estimates as to each Assumed Contract and Assumed Lease of all Cure Amounts to assume and assign such Assumed Contract and Assumed Leases, (iv) the identity of Buyer, (v) the deadline by which any such contract or lease counterparty may file an objection to the proposed assumption and assignment and/or Cure Amount, and the procedures relating thereto, which deadline shall not be less than five (5) days prior to the Bid Deadline (as such term is defined in the Bidding Procedures), (vi) that in cases in which a Seller is unable to establish that a default exists, the relevant Cure Amount shall be set at $0.00, and (vii) that such contract or lease counterparty's failure to object timely to the

16

proposed assumption or Cure Amount will be deemed to be consent to such assumption and to the Sellers's scheduled Cure Amount.

(k)     If the Bidding Procedures Order, the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order, or other such order), the Sellers shall use its commercially reasonable efforts to prosecute such appeal, petition or motion and to obtain an expedited resolution of any such appeal, petition or motion.

(l)     On the Effective Date, Sellers shall have performed and complied with all agreements, covenants, obligations and conditions required by this Agreement to be performed or complied with prior to or at the Closing.

**SECTION 8.**
**CONDITIONS TO CLOSING**.

(a)     <u>Conditions to Buyer's Obligation to Close</u>.  The obligation of the Buyer to perform under this Agreement and to effect the transactions contemplated hereby shall be subject to the satisfaction, or waiver by the Buyer at or prior to the Closing, of each of the following conditions:

(i)     Each of the Bidding Procedures Order and the Sale Order shall have been entered by the Bankruptcy Court, which shall have become Final Orders. "Final Order" shall mean an Order of the Bankruptcy Court (a) as to which the time to appeal or reconsider shall have expired and as to which no appeal or motion to reconsider shall then be pending, or (b) if an appeal or motion for reconsideration shall have been filed or sought, either (i) no stay of the Order shall be in effect or (ii) if such a stay shall have been granted by the Bankruptcy Court, then (A) the stay shall have been dissolved or (B) a final Order of the district court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court Order or timely motion to seek review or rehearing of such Order shall have been made, any court of appeals having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) Order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Buyer in its sole discretion may treat as not being a Final Order, any Order for which an appeal, motion to seek review, motion to seek rehearing, or any similar motion is pending notwithstanding that such Order is not then subject to stay;

(ii)     The Bidding Procedures Order shall have been approved no later than February 4, 2016. The Sale Order shall have been entered no later than April 8, 2016;

17

(iii)    The representations and warranties of Sellers and Sellers' Stockholder made in Section 4 of the Agreement shall be true and correct in all material respects on the Effective Date;

(iv)    Sellers shall have performed and complied with all agreements, covenants, obligations and conditions required by this Agreement to be performed or complied with prior to or at the Closing;

(v)    Each of the deliveries required to be made to Buyer pursuant to Section 3(e) of this Agreement shall have been so delivered;

(vi)    Buyer's satisfaction, in Buyer's sole and absolute discretion with a) review of the quantity, type, kind and quality of all Transferred Assets to be conveyed hereunder, both tangible and intangible, including all Vehicles and equipment, and good clear record and marketable title to all such assets, free of all encumbrances and security interests; b) review of all contracts and agreements to which any Seller is a party including, without limitation any government/agency contracts and customer contracts; c) review of accounting, legal, insurance, and business due diligence matters; d) there being no material adverse change in the Business or its prospects; f) the good standing of the Seller and the Permits with all applicable permitting authorities; g) environmental review and inspections of all land, structures and improvements including all systems which are a part of Seller's Business Premises, and h) acceptable agreements with key employees of the Business; and

(b)    Conditions to Sellers' Obligation to Close.    The obligation of the Sellers under this Agreement to effect the transactions contemplated hereby shall be subject to the satisfaction or waiver at or prior to the Closing, of each of the following conditions:

(i)    The representations and warranties of Buyer made in Section 5 shall be true and correct in all material respects on the Effective Date, except as would not have a material adverse effect;

(ii)    Buyer shall have performed, satisfied and complied in all material respects with all covenants, agreements obligations and conditions required by this Agreement to be performed or complied with prior to or at the Closing; and

(iii)    Each of the deliveries required to be made to Sellers pursuant to Section 3(d) of this Agreement shall have been so delivered.

## SECTION 9.
## TERMINATION

(a)    Termination. Notwithstanding anything in this Agreement to the contrary, this Agreement may not be terminated prior to the Closing, except as follows:

(i)    by mutual consent in writing of Buyer, on the one hand, and Sellers, on the other hand;

(ii)      by Buyer, at its sole discretion, if any of the conditions set forth in Section 8(a) have not been satisfied;

(iii)      by Buyer, immediately by written notice to Sellers if any event occurs or fact or condition exists which makes it impossible for Sellers to satisfy, or causes Sellers to be unable to satisfy, one or more conditions to the obligations of Buyer to consummate the Transactions as set forth in Section 8(a) prior to the Outside Date;

(iv)      automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon entry of an Order by the Bankruptcy Court approving an Alternate Transaction, under which Order the Buyer is not approved as the "**Back-Up Bidder**";

(v)      automatically and without any action or notice by Sellers to Buyer, or Buyer to Sellers, immediately upon consummation of an Alternate Transaction for which Buyer has been approved as the Back-Up Bidder; and

(b)      Effect of Termination: If this Agreement is terminated pursuant to Section 9(a), all further obligations of the Parties under this Agreement shall terminate without further liability of any Party to another; provided, however, that (i) the obligations of the Parties contained in Section 10(d) and Section 11 shall survive any such termination, and (ii) a termination under Section 9(a) shall not relieve any Party of any liability for a breach of, or for any misrepresentation under this Agreement, or be deemed to constitute a waiver of any available remedy (including specific performance, if available) for any such breach or misrepresentation

(c)      Buyer Protections: Sellers agree and acknowledge that Buyer's negotiation and execution of this Agreement have required a substantial investment of management time and a significant commitment of financial and other resources by Buyer, that the negotiation and execution of this Agreement have provided value to Sellers, and that but for the protections afforded in this Section, Buyer would not have agreed to enter into this Agreement.

(i)      Therefore, if this Agreement is terminated pursuant to Section 9(a) hereof, each of a break-up fee in an amount equal to $37,250 (the "Break-Up Fee") shall immediately become earned and payable immediately from the proceeds of such Alternate Transaction pursuant to Section 9(c)(iv) hereof.

(ii)      The Break-Up Fee shall be a superpriority administrative expense priority obligation of Sellers under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Section 503(b) and 507(a) of the Bankruptcy Code, subject only to the super-priority and secured Claims of the DIP Lender under any DIP Order.

(iii)      By wire transfer of immediately available funds to an account designated by Buyer in writing, (x) the Successful Bidder shall pay any earned Break-Up Fee and Expense Reimbursement, pursuant to Section 9(c)(1) hereof, within two (2) Business

19

Days following the closing of the Alternate Transaction (and only from the proceeds of such Alternate Transaction) for which the Break-Up Fee was earned.

(iv)    The payment of the Break-Up Fee as provided herein shall be free and clear of any Encumbrance that any other Person may have or assert in such Alternate Transaction proceeds or otherwise available cash.

(v)    Sellers hereby acknowledge that the obligation to pay the Break-Up Fee (to the extent due hereunder) shall survive the termination of this Agreement and shall have administrative priority status against Sellers and their estates.

(vi)    Notwithstanding anything to the contrary herein, Buyer shall have the sole and exclusive right to determine whether to serve as the Back-Up Bidder upon selection of an Alternate Transaction by the Sellers.

## SECTION 10.
## POST-CLOSING COVENANTS.

(a)    Access to Information.  Subject to the confidentiality provisions set forth in Section 10(c) below, following the Closing, each party shall afford to the other party and to the other party's authorized accountants, counsel and other designated representatives reasonable access, during normal business hours and upon reasonable prior notice so as to not unreasonably interfere with the conduct of the Business, to all non-privileged records, books, contracts, instruments, documents, correspondence, computer data and other data and information (collectively, "Information") within the possession or control of such party or its affiliates, relating to the Business prior to the Closing, insofar as such access is reasonably required by the other party  for preparation of financial reporting and accounting matters, preparing financial statements, preparing and filing of any tax returns, prosecuting any claims for refund, defending any tax claims or assessment, prosecuting, defending or settling any litigation, and for performing this Agreement and the transactions contemplated hereby.

(b)    Access to Personnel.  Following the Closing, each party shall use reasonable efforts to make available to the other party, upon written request and during normal business hours, such party's officers, directors, employees and agents to the extent that such persons may reasonably be required in connection with any legal, administrative or other proceedings in which the requesting party may from time to time be involved relating to the Business prior to the Closing or for any other matter referred to in Section 10(a).

(c)    Continued Operations: To the extent required and consistent with the terms herein, Buyer shall have the right following the Closing Date, to operate under the Permits related to the Business, until Buyer is able to transfer such Permits for itself or obtain replacement Permits, pursuant to the Limited Power of Attorney, which Sellers agree to execute and deliver at the Closing

(d)    Confidentiality.  Each of Buyer and Sellers shall hold, and shall use reasonable efforts to cause its affiliates, consultants and advisors to hold, in strict confidence all information concerning the other furnished to it by the other party or the other party's representatives ("**Restricted Information**") at any time prior to Closing or pursuant to this

20

Section 10(c) except to the extent that such information (i) is or becomes generally available to the public other than as a result of a disclosure by the receiving party in violation of the terms of this Section 10(c), (ii) was within the possession of the receiving party prior to it being furnished to the receiving party by or on behalf of the other party pursuant hereto, provided that the source of such information was not known by the receiving party at the time of receipt to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the other party or any other party with respect to such information, (iii) is or becomes available to the receiving party from a source other than the other party, provided that such source is not, to the knowledge of the receiving party at the time of receipt, bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the other party or any other party with respect to such information, or (iv) was or is independently developed by the receiving party without utilizing any Restricted Information or violating any of the receiving party's obligations under this Agreement), and each party shall not release or disclose such Restricted Information to any other person, except its auditors, attorneys, financial advisors, bankers and other consultants and advisors, unless compelled to disclose such Restricted Information by judicial or administrative process or by other requirements of law; provided, however, that in the case of disclosure compelled by judicial or administrative process, the disclosing party shall (to the extent permitted by applicable law) notify the non-disclosing party promptly of the request or requirement so that the non-disclosing party may seek an appropriate protective order or waive compliance with the provisions of this Section 10(c). If, in the absence of a protective order or the receipt of a waiver hereunder, a party is compelled to disclose any Restricted Information by judicial or administrative process, such party may so disclose the Restricted Information; provided, however, that, at the written request of the non-disclosing party, the disclosing party shall use commercially reasonable efforts to obtain, at the expense of the non-disclosing party, an order or other assurance that confidential treatment will be accorded to such portion of the Restricted Information required to be disclosed. Notwithstanding the above, the Buyer may broadcast a press release announcing the closing of the transaction provided that no financial terms are disclosed in such press release.

**SECTION 11.**
**MISCELLANEOUS.**

(a)      Expenses.  Buyer and Sellers shall each pay their own expenses, including the fees and expenses of its counsel and accountants, incurred in connection with this transaction, except as otherwise provided herein.

(b)      Notices.  Any and all notices, requests, demands and other communications made hereunder by a party hereto shall be deemed to have been duly made when delivered by hand or mailed, postage prepaid, certified or registered mail, with return receipt requested, by overnight delivery service by a nationally recognized delivery service (such as Federal Express or UPS) or via electronic mail, and addressed as follows:

If to Buyer:

David H. Marcou, Jr., Manager

21

Derek R. Marcou, Manager
MTG Florida LLC
224 Calvary Street
Waltham, MA 02453
dmarcoujr@harrisontrans.com

with copies to:

Steven D. Frank, General Counsel
MTG Florida LLC
224 Calvary Street
Waltham MA 02453
sfrank@harrisontrans.com

If to Sellers:

Eyal Berger
Akerman LLP
Las Olas Centre II, Suite 1600
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301-2999

The addresses given above may be changed by notice given in the same manner as is provided for the giving of notices hereunder.

(c)     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Massachusetts without regard to choice of law principles.

(d)     Binding Agreement.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors, assigns and personal representatives.

(e)     Assignment.  This Agreement is not assignable by either party without the prior written consent of the other party hereto; provided, however, that Buyer may assign its rights and interest under this Agreement at any time prior to or at Closing to an affiliate or affiliates of Buyer, under common ownership with Buyer, or may require Sellers to convey and transfer the Vehicles and the remaining Transferred Assets to such affiliates as Buyer may designate; provided, that in the event of such assignment by Buyer, Buyer shall remain primarily obligated to the Company for all of the Buyer's obligations hereunder to the extent not performed by such affiliate.

(f)     Schedules and Exhibits.  All Schedules and Exhibits referred to herein are a part of this Agreement.

(g)     Counterparts.   This Agreement may be executed in two or more counterparts, each of with shall be deemed an original, and Sellers and Buyer may become a

party hereto by executing a counterpart hereof. This Agreement and any counterpart so executed shall be deemed to be one and the same instrument.

      (h)      <u>Complete Agreement; Amendments; Waivers</u>. This Agreement and the Transaction Documents, together with the Exhibits and Schedules hereto and thereto, contain the entire agreement of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect thereto. This Agreement may be amended only by written agreement executed by both parties hereto. Failure on the part of Sellers or Buyer to complain of any action or non-action on the part of the other, no matter how long the same may continue, shall never be a waiver by Sellers or Buyer of any of their respective rights hereunder. No waiver at any time of any of the provisions hereof by Sellers or Buyer shall be construed as a waiver of any of the other provisions hereof, and a waiver at any time of the provisions hereof shall not be construed as a waiver at any subsequent time of the same provisions.

      (i)      <u>Headings; Form of Words</u>. The headings contained in this Agreement (including but not limited to the titles of the Schedules and Exhibits hereto) have been inserted for the convenience of reference only, and neither such headings nor the placement of any term hereof under any particular heading shall in any way restrict or modify any of the terms or provisions hereof. Terms used in the singular shall be read in the plural, and vice versa, and terms used in the masculine gender shall be read in the feminine or neuter gender when the context so requires, and vice versa. The provisions of this Agreement shall be construed as a whole, according to their common meaning. This Agreement shall be deemed to have been drafted by all parties hereto and no rule of construction requiring interpretation for or against either party shall be applicable.

* * *

IN WITNESS WHEREOF, the parties have duly executed and delivered this Agreement as of the date first above written.

**Buyer:**

**MTG FLORIDA LLC**

By:_____
Name: DEREK MARCUS
Title: MANAGER

**Sellers:**

**WORLDWIDE TRANSPORTATION SERVICES, INC.**

By:_____
Name:
Title:

**WORLD WIDE LIMOUSINE, INC.**

By:_____
Name:
Title:

**WORLDWIDE INVESTMENT I, LLC**

By:_____
Name:
Title:

**WORLDWIDE INVESTMENT II, LLC**

By:_____
Name:
Title:

67935816_5

WORLDWIDE INVESTMENT III, LLC

By:_____
Name:
Title:


**Sellers' Stockholder:**

_____


[Signature Page to Asset Purchase Agreement]

## Exhibit A

## Assignment Agreement

(see attached)

<u>ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

This Assignment and Assumption Agreement, dated January 27, 2016, is made by and between **MTG FLORIDA LLC** (the "**Assignee**"), and **Worldwide Transportation Services, Inc. (Miami)**, a Florida corporation, **Worldwide Investments I, LLC**, a Florida limited liability company, **Worldwide Investments II, LLC**, a Florida limited liability company, **Worldwide Investments III, LLC**, a Florida limited liability company, (the "**Assignor**").  All capitalized words and terms used in this Assignment and Assumption Agreement and not defined herein shall have the respective meanings ascribed to them in the Asset Purchase Agreement dated as of January 26, 2015, 2016 by and among the Assignee the Assignor and Sellers' Stockholder (the "**Agreement**").

WHEREAS, pursuant to the Agreement, the Assignor has agreed to sell, transfer, convey, assign and deliver to the Assignee certain assets of the Assignor including Assignor's interests under certain Assumed Contracts (the "**Assumed Contracts**"), each of which is set forth in Exhibit A attached hereto; and

WHEREAS, in partial consideration therefor, the Agreement requires the Assignee to assume the obligations and liabilities of the Assignor under the Assumed Contracts.

NOW, THEREFORE, for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignee hereby agrees as follows:

1. Assignor hereby assigns, transfers, and conveys to Assignee all of Assignor's respective right, title and interests in and under each of the Assumed Contracts.

2. The Assignee hereby assumes and agrees to perform, pay and discharge all obligations of the Assignor under each of the Assumed Contracts.

3. Nothing herein shall be deemed to deprive the Assignee of any defenses, set-offs or counterclaims which the Assignor may have had or which the Assignee shall have with respect to any of the obligations, liabilities and commitments hereby assumed (the "**Defenses and Claims**").  The Assignor hereby transfers, conveys and assigns to the Assignee all Defenses and Claims and agrees to cooperate with the Assignee to maintain, secure, perfect and enforce such Defenses and Claims, including the signing of any documents, the giving of any testimony or the taking of any such other action as is reasonably requested by the Assignee in connection with such Defenses and Claims.

4. The Assignee, by its execution of this Assignment and Assumption Agreement, and the Assignor, by its acceptance of this Assignment and Assumption Agreement, each hereby acknowledges and agrees that neither the representations and warranties nor the rights and remedies of either party under the Agreement shall be deemed to be

enlarged, reduced, modified or altered in any way by such execution and acceptance of this instrument.

IN WITNESS WHEREOF, the Assignor and the Assignee have caused this Assignment and Assumption Agreement to be executed under seal as of the date first above written.


ASSIGNEE:


**MTG FLORIDA LLC**


By: _____

Name:

Title:

ASSIGNOR:

**WORLDWIDE TRANSPORTATION SERVICES, INC.**


By:_____
Name:
Title:

**WORLD WIDE LIMOUSINE, INC.**


By:_____
Name:
Title:

**WORLDWIDE INVESTMENT I, LLC**


By:_____
Name:
Title:

{37255970;1}

67935816_5

**WORLDWIDE INVESTMENT II, LLC**

By:_____
Name:
Title:


**WORLDWIDE INVESTMENT III, LLC**

By:_____
Name:
Title:

**Exhibit B-1**

**Bills of Sale (Vehicles)**

(see attached)

**Exhibit B-2**

**Bills of Sale (other Purchased Assets)**

(see attached)

KNOW ALL MEN BY THESE PRESENTS, that for the amount of

_____DOLLARS
($_____.00), the receipt and sufficiency of which is hereby acknowledged, Worldwide Transportation Services, Inc. (Miami), a Florida corporation, Worldwide Limousine Inc., a Florida corporation, Worldwide Investments I, LLC, a Florida limited liability company, Worldwide Investments II, LLC, a Florida limited liability company, Worldwide Investments III, LLC, a Florida limited liability company, (collectively the "Sellers"), all having a principal address of 19006 SW 76th Ave, Miami, FL 33157, does hereby grant, sell, transfer and deliver to MTG FLORIDA LLC., a Massachusetts corporation having an office address of 224 Calvary Street, Waltham MA 02453 ("Buyer"), Seller's entire right, title and interest in and to those _____ (____) certain vehicles (the "Vehicles") identified on SCHEDULE A attached hereto.

**SELLER IS SELLING AND BUYER IS PURCHASING THE VEHICLES AS IS AND WITH ALL FAULTS AND SELLER MAKES NO GUARANTIES OR WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED BY LAW (INCLUDING ANY WARRANTIES AS TO FITNESS OR MERCHANTABILITY), ALL OF WHICH BEING HEREBY EXPRESSLY DISCLAIMED.**

TO HAVE AND TO HOLD the Vehicles to Buyer and its successors and assigns, for his and their own use and benefit forever.

IN WITNESS WHEREOF, Seller and Buyer have caused this Bill of Sale to be executed as an instrument under seal on this ____ day of _____, 2016.


_____,


**WORLDWIDE TRANSPORTATION SERVICES, INC.**


By:_____
Name:
Title:

**WORLD WIDE LIMOUSINE, INC.**


By:_____
Name:
Title:

**WORLDWIDE INVESTMENT I, LLC**


By:_____
Name:
Title:


**WORLDWIDE INVESTMENT II, LLC**


By:_____
Name:
Title:


**WORLDWIDE INVESTMENT III, LLC**


By:_____
Name:
Title:

<u>Accepted:</u>


**MTG FLORIDA LLC.**


By:_____

Name:
Title:

SCHEDULE A

**VEHICLES**

| **YEAR** | **MAKE** | **MODEL** | **VIN** |
|----------|----------|-----------|---------|

# BILL OF SALE

This Bill of Sale, dated this _____ day of _____, 2016, is executed and delivered by Worldwide Transportation Services, Inc. (Miami), a Florida corporation, Worldwide Limousine Inc., a Florida corporation, Worldwide Investments I, LLC, a Florida limited liability company, Worldwide Investments II, LLC, a Florida limited liability company, Worldwide Investments III, LLC, a Florida limited liability company, (collectively the "Sellers"), all having a principal address of 19006 SW 76th Ave, Miami, FL 33157, to MTG FLORIDA LLC., a Massachusetts corporation having an office address of 224 Calvary Street, Waltham MA 02453 ("Buyer"), All capitalized terms used in this Bill of Sale and not defined herein shall have the respective meanings ascribed to such terms in the Asset Purchase Agreement, by and among the Seller, Buyer and others, dated January 26, 2016 (the "Agreement").

WHEREAS, pursuant to the Agreement, the Seller has agreed to sell, transfer, convey, assign and deliver to the Buyer substantially all of the assets of its Business;

NOW, THEREFORE, in consideration of the execution and delivery of the Agreement and for other good and valuable consideration, including Buyer's payment of the Purchase Price, the receipt and sufficiency of which are hereby acknowledged, the Seller hereby agrees as follows:

1.     The Seller hereby sells, transfers, conveys, assigns and delivers to the Buyer, its successors and assigns, to have and to hold forever, all of the Seller's right, title and interest in and to the Purchased Assets.

2.     This Bill of Sale has been executed and delivered by the Seller in accordance with the Agreement and is expressly made subject to the terms set forth therein.

3.     Seller and Buyer agree that the Purchased Assets are being sold by Seller to Buyer and are being purchased by Buyer from Seller "AS IS" and the Seller makes no warranty in respect of such Purchased Assets of any nature or description whatsoever other than as expressly stated in the Agreement, including the warranty of merchantability or the warranty of fitness for a particular purpose. Buyer is aware of the condition of the Purchased Assets or has been provided with a reasonable period to inspect the same, and Buyer agrees to accept the Purchased Assets in their current condition.

4.     Seller, by its execution of this Bill of Sale, hereby acknowledges and agrees that neither Seller's representations and warranties nor Buyer's rights and remedies under the Agreement shall be deemed to be reduced, modified or altered in any way by this Bill of Sale.

IN WITNESS WHEREOF, the Seller and the Buyer have caused this Bill of Sale to be executed under seal as of the date first above written.

_____

**WORLDWIDE TRANSPORTATION SERVICES, INC.**

By:_____
Name:
Title:

**WORLD WIDE LIMOUSINE, INC.**

By:_____
Name:
Title:

**WORLDWIDE INVESTMENT I, LLC**

By:_____
Name:
Title:

**WORLDWIDE INVESTMENT II, LLC**

By:_____
Name:
Title:

**WORLDWIDE INVESTMENT III, LLC**

By:_____
Name:
Title:

Accepted:

{37255970;1}

67935816_5

**MTG FLORIDA LLC.**

By:_____

Name:
Title:

**Exhibit C**

**Employment Agreement**

**MTG FLORIDA LLC**
**224 Calvary Street, Waltham, MA 02453**

January 27, 2016

Ali A. Malek

_____

**_____**

      Re:     <u>**Executive Employment Agreement**</u>

Dear Ali:

      This letter is to confirm our understanding with respect to your future employment by MTG Florida LLC (the "Company") (the terms and conditions agreed to in this letter are hereinafter referred to as the "Agreement"). In consideration of the mutual promises and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, including full performance by you of your specific obligations defined herein and under that certain Asset Purchase Agreement dated January 27 between **MTG FLORIDA LLC,** as buyer, and **Worldwide Transportation Services, Inc. (Miami)**, **Worldwide Investments I, LLC**, **Worldwide Investments II, LLC**, **Worldwide Investments III, LLC,** and **Worldwide Limousines, Inc.**, as sellers (collectively "Worldwide"), and you (the "Asset Purchase Agreement"), we have agreed as follows:

      Capitalized terms used herein shall have the same meaning as those set forth in the Asset Purchase Agreement unless otherwise defined herein.

      1.    <u>Employment</u>.    A. Condition Precedent: The Company's obligation to employee you under the terms of this Agreement shall be subject to the occurrence of the Effective Date as that term is defined under the Asset Purchase Agreement. If the Effective Date does not occur or if the Asset Purchase Agreement is otherwise terminated, the Company has no obligations to you and this Agreement will be considered null and void.

      B. <u>Position</u>. Subject to the terms and conditions of this Agreement, the Company will employ you, and you will be employed by the Company, as General Manager ("Title"), for the Company's Worldwide Chauffeured Transportation Operations in the southeast region of Florida, including Dade and Broward counties ("the "Region"). The term "Worldwide Chauffeured Transportation Operations," as used in this Agreement, shall mean i) the

{37255970;1}

Company's operations and business as purchased from Worldwide, in accordance with the Asset Purchase Agreement, and ii) as may be expanded upon by the Company. Specifically excluded from the Company's Worldwide Chauffeured Transportation Operations are all businesses and activities engaged in by the Company prior to and after the Company's acquisition of Worldwide's assets which are unrelated to Worldwide's assets and business. You will have the responsibilities, duties and authority commensurate with the position of General Manager. Your primary responsibilities will include management and expansion of the Company's chauffeured transportation business, customer relations, transitional assistance and general management assistance and responsibility as may be assigned by the Company, all subject to the oversight and approval of the Company's Board of Managers (the "Board"). The principal location at which you will perform such services will be the Company's facilities located within the Region, as may be hereinafter and from time to time established by the Company, as directed from time-to-time by the Company. You understand, acknowledge and agree that you shall have no employment with or management authority over or with respect to any existing or future affiliate of the Company including, without limitation, D&D Dispatch, Inc., Veterans Taxi of Newton LLC, Veterans Transportation LLC, Harrison Transportation Services, Inc., Charles River Automotive LLC, Harrison Global LLC, Harrison Coach LLC, MTG Acquisitions LLC, DDSSBOS LLC or Waltham River's Edge LLC (collectively "Company's Affiliates").

      C. <u>Performance of Duties</u>. You agree that during your term of employment with the Company, you shall devote your full-time efforts (not less than 40 hours of your time per week) during the Company's normal business hours and use your best efforts, knowledge and skill to the business affairs of the Company and shall perform your duties faithfully and efficiently subject to the lawful direction of the management of the Company; provided that the foregoing shall not limit or prevent you from serving on the board of directors of charitable organizations or other business corporations not in competition with the Company.

    2.    <u>Term of Employment</u>.

    (a)    <u>Term; Termination</u>. Subject to the terms hereof, your employment hereunder will commence on the Effective Date (the "Commencement Date") and, unless sooner terminated as provided herein, will continue until that date that is five (5) years from today (the "Term").

    Notwithstanding the foregoing, your employment hereunder will terminate upon the first to occur of the following:

        (i)    Immediately upon your death;

        (ii)    By the Company:

            (A)    By written notice to you effective the date of such notice, following your failure, due to illness, accident or any other

physical or mental incapacity, to perform the essential functions of your position for an aggregate of 90 business days within any period of 180 consecutive business days during the term hereof as determined by a physician selected by you ("Disability"), provided that if applicable law provides any provision regarding disability that is more favorable to you than that set forth herein, such more favorable provision will govern; or

      (B)    By written notice to you effective the date of such notice, for Cause (as defined below); or

      (C)    By written notice to you effective 14 days after the date of such notice and subject to Section 4 hereof, without Cause;

      (iii)    By you:

      (A)    At any time by written notice to the Company effective 30 days after the date of such notice.

    (b)    Definition of "Cause". For purposes of this Agreement, "Cause" means (i) your conviction of a felony, either in connection with the performance of your obligations to the Company or otherwise, (ii) your willful disloyalty or deliberate dishonesty, (iii) the commission by you of an act of fraud or embezzlement against the Company, (iv) your engaging in willful or reckless misconduct or negligence in connection with any property or activity of the Company, (v) your repeated and intemperate use of alcohol or illegal drugs after written notice from the Board that such use, if continued, would result in the termination of your employment hereunder, (vi) a material breach by you of any provision of this Agreement which breach is not cured within 14 days after delivery to you by the Company of written notice of such breach, provided that if such breach is not capable of being cured within such 14 day period, you will have a reasonable additional period to cure such breach but only if you promptly commence and continue good faith efforts to cure such breach, or (vii) a material breach by you under the Asset Purchase Agreement. Any determination under this Section 2(b) will be made by the Board voting on such determination. With respect to any such determination, the Board will act fairly and in utmost good faith and will give you and your counsel an opportunity to appear and be heard at a meeting of the Board (in person or via telephone at the Board's discretion) and present evidence on your behalf.

    (c)    Early Termination Right. Notwithstanding anything set forth elsewhere in this Agreement to the contrary, either party may terminate this Agreement for any reason at any time after the third anniversary date of this Agreement upon not less than sixty (60) days' prior written notice to the other party (the "Early Termination Right").

{37255970;1}

3.    Compensation.

(a)    Base Salary.  While you are employed hereunder, the Company will pay you a base salary at the annual rate of $150,000.00 (the "Base Salary") to be paid in substantially equal weekly installments.  The frequency of such periodic installments and corresponding change in installment amounts may be changed by Company in accordance with the Company's payroll practices as in effect from time to time.  The Company will deduct from each such installment any amounts required to be deducted or withheld under applicable law or under any employee benefit plans in which you participate.

(b)    Discretionary Bonus.    Commencing at the end of calendar year 2016, you may be entitled to earn an annual discretionary bonus of up to $50,000 as may be determined by the Company in the Company's sole and absolute discretion.    The Company's decision to pay any Discretionary Bonus is determined by numerous factors including, without limitation, your performance, market factors, conditions and outlook and economic conditions and outlook.  In no event will you be entitled to any Discretionary Bonus if you are not employed by the Company as of December 31 for the applicable year.  You agree, acknowledge and understand that Company is under no obligation at any time to pay any Discretionary Bonus and that payment of a Discretionary Bonus for one calendar year does not guarantee that any Discretionary Bonus will be paid in subsequent calendar year(s).  Any annual Discretionary Bonus to be paid by the Company shall be paid prior April 30 of the next calendar year.

(c)    Vacation.  You will be entitled to 15 paid vacation days in each calendar year and paid holidays and personal days in accordance with the Company's policies for its employees as in effect from time to time.  Accrued unused vacation may not be carried over from year to year.

(d)    Fringe Benefits.  You will be entitled only to participate in the Company's medical and dental insurance plan (collectively, the "Fringe Benefits"), to the extent offered by the Company to its employees during the term hereof provided that the Fringe Benefits will not include any stock option or similar plans relating to the grant of equity securities of the Company and provided you contribute toward the costs of such Fringe Benefits on the same terms offered to the Company's employees.

(e)    Reimbursement of Expenses. The Company will reimburse you for all ordinary and reasonable out-of-pocket business expenses that are incurred by you in furtherance of the Company's business in accordance with the Company's policies with respect thereto as in effect from time to time; provided, that no reimbursement will be made for any expenditure in excess of $250.00 absent prior written authorization from the Company.

(f)    Indemnification.    The Company will indemnify you to the extent permitted by its charter and by-laws and by applicable law against all costs, charges and expenses, including, without limitation, attorneys' fees, incurred or sustained by you in connection with any action, suit or proceeding to which you may be made a party by reason of being an employee of the Company.  In connection with the foregoing, you will be covered under any liability insurance policy that protects other officers of the Company.  Notwithstanding the above, you will not be entitled to indemnification for any matter upon which you may become liable under the terms of the Asset Purchase Agreement and nothing set forth in this Agreement shall modify, reduce or affect in any manner your indemnification obligations arising under the Asset Purchase Agreement.

4.    Compensation upon Termination.

(a)    Definition of Accrued Obligations.  For purposes of this Agreement, "Accrued Obligations" means (i) the portion of your Base Salary as has accrued prior to any termination of your employment with the Company and has not yet been paid, (ii) an amount equal to the value of your accrued unused vacation days and (iii) the amount of any expenses properly incurred by you on behalf of the Company prior to any such termination and not yet reimbursed.

(b)    Death or Disability.  If your employment hereunder is terminated as a result of your death or Disability, The Company will pay the Accrued Obligations to you (or your estate) promptly following such termination and no other compensation.

(c)    Termination for Cause.  If your employment hereunder is terminated by the Company for Cause (as described above), the Company will pay the Accrued Obligations to you promptly following such termination and no other compensation.

(d)    Termination Without Cause.   If your employment hereunder is terminated by the Company without Cause:

(i)    The Company will pay the Accrued Obligations to you promptly following such termination;

(ii)    The Company will continue to pay you the Base Salary at the rate in effect at such termination in accordance with Section 3(a) of this Agreement for the period commencing on the date of such termination and ending on the end of the Term; and

(iii)    The Company will continue to provide you with the Fringe Benefits for so long as it is obligated to continue payments of Base Salary pursuant to Section 4(d)(ii) above, subject to applicable law and the terms of the respective policies and subject to your continued contribution to such Fringe Benefits as may be required by the Company.

(e)    Termination by You.  In the event you terminate your employment, you will be paid the Accrued Obligations and no other compensation.

{37255970;1}

67935816_5

(f)    Early Termination Right.    In the event the Company exercises its Early Termination Right, you will be paid the Accrued Obligations and no other compensation.

5.    Company Property.  Upon termination of your employment hereunder for any reason or for no reason, you will deliver to the Company any and all property of the Company which may be in your possession, custody or control including without limitation, all memoranda, notes, records, reports, customer lists and information, employee lists and information, asset information, and all other documents and photocopies of the same and all such information stored on electronic media.  You shall also return all laptop computers, cell phones and all other equipment belonging to Company upon termination for any reason of your employment.

6.    No Competing Businesses or Activities.

You agree that you shall be bound by and agree to each and every term and provision set forth in Section 6 (**POST-CLOSING PRESERVATION OF GOODWILL OF THE BUSINESS BY SELLERS AND SELLERS' STOCKHOLDER**) of the Asset Purchase Agreement to which this Agreement is attached which terms and provisions are hereby incorporated herein.

6.    General.

(a)    Notices.  All notices, requests, consents and other communications hereunder will be in writing, will be addressed to the receiving party's address set forth above or to such other address as a party may designate by notice hereunder, and will be either (i) delivered by hand, (ii) sent by nationally recognized overnight courier (e.g. Federal Express), or (iii) sent by registered or certified mail, return receipt requested, postage prepaid.  All notices, requests, consents and other communications hereunder will be deemed to have been given either (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (ii) if sent by overnight courier, on the next business day following the day such notice is delivered to the courier service, or (iii) if sent by registered or certified mail, on the fifth business day following the day such mailing is made.

(b)    Entire Agreement.  This Agreement, together with the other agreements specifically referred to herein, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in this Agreement will affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement.

{37255970;1}

67935816_5

    (c)    <u>Modifications and Amendments</u>.  The terms and provisions of this Agreement may be modified or amended only by written agreement executed by the parties hereto.

    (d)    <u>Waivers and Consents</u>.  The terms and provisions of this Agreement may be waived, or consent for the departure therefrom granted, only by written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent will be deemed to be or will constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or consent will be effective only in the specific instance and for the purpose for which it was given, and will not constitute a continuing waiver or consent.

    (e)    <u>Assignment</u>.  You may not assign your rights and obligations under this Agreement without the prior written consent of the Company.

    (f)    <u>Benefit</u>.  All statements, representations, warranties, covenants and agreements in this Agreement will be binding on the parties hereto and will inure to the benefit of the respective successors and permitted assigns of each party hereto. Nothing in this Agreement will be construed to create any rights or obligations except among the parties hereto, and no person or entity will be regarded as a third-party beneficiary of this Agreement.

    (g)    <u>Governing Law</u>.  This Agreement and the rights and obligations of the parties hereunder will be construed in accordance with and governed by the law of the State of Florida, without giving effect to the conflict of law principles thereof.  This agreement shall take effect as an instrument under seal.

    (h)    <u>Jurisdiction, Venue and Service of Process</u>.  Any legal action or proceeding with respect to this Agreement shall be brought in the courts of the State of Florida.  By execution and delivery of this Agreement, each of the parties hereto accepts for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts.

    (i)    <u>Severability</u>.  The parties intend this Agreement to be enforced as written. However, if any portion or provision of this Agreement is to any extent declared illegal or unenforceable by a duly authorized court having jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, will not be affected thereby, and each portion and provision of this Agreement will be valid arid enforceable to the fullest extent permitted by law.

(k)    <u>Headings and Captions</u>.  The headings and captions of the various subdivisions of this Agreement are for convenience of reference only and will in no way modify or affect the meaning or construction of any of the terms or provisions hereof

(l)    <u>No Waiver of Rights, Powers and Remedies</u>.  No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, will operate as a waiver of any such right, power or remedy of the party. No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, will preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. The election of any remedy by a party hereto will not constitute a waiver of the right of such party to pursue other available remedies. No notice to or demand on a party not expressly required under this Agreement will entitle the party receiving such notice or demand to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the party giving such notice or demand to any other or further action in any circumstances without such notice or demand.

(m)    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, and by different parties hereto on separate counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

        If the foregoing accurately sets forth our agreement, please so indicate by signing and returning to us the enclosed copy of this letter.

                                        Very truly yours,

                                        **MTG FLORIDA LLC,**

                                        By: _____

                                                Name: Derek Marcou

                                                Title: Manager

Accepted and Approved:

Employee-

_____          _____

**Ali A. Malek**                                          Date

(see attached)

**Exhibit D**

**Trademark Assignment**

(see attached)

## TRADEMARK ASSIGNMENT

WHEREAS, **Worldwide Transportation Services, Inc. (Miami)**, a Florida corporation, **Worldwide Investments I, LLC**, a Florida limited liability company, **Worldwide Investments II, LLC**, a Florida limited liability company, **Worldwide Investments III, LLC**, a Florida limited liability company, ("Assignors"), are the owners of the trademark and service mark and the corresponding registration (the "WW Mark") set forth in Exhibit A attached hereto and filed with the United States Patent and Trademark Office (the "Trademark Office");

WHEREAS, **DDSSBOS LLC**, a Massachusetts limited liability company located at 224 Calvary Street, Waltham, Massachusetts 02453 ("**Assignee**"), wishes to acquire Assignors' interests in and to the WW Mark together with the goodwill of the business with which said marks are associated;

NOW, THEREFORE, for good and valuable consideration, Assignor hereby assigns, transfers and sets over unto to Assignee all of Assignors' right, title and interest in, to and under the WW Mark, as well as all the goodwill relating to the business with which the mark is associated, for the use and enjoyment of the Assignee and its successors and assigns forever; and

HEREBY AUTHORIZES AND REQUESTS the Trademark Office to record the Assignee as the owner of the WW Mark and to grant any and all trademark registrations and renewals arising from the WW Mark to Assignee; and

HEREBY FURTHER AGREES that Assignors will, upon the request of Assignee, promptly execute and deliver to Assignee any and all papers, instruments or affidavits required or useful to apply for, maintain, issue and enforce the WW Mark; and

HEREBY FURTHER SELLS, ASSIGNS, TRANSFERS AND SETS OVER unto the Assignee any income, royalties, damages, or payment due or payable as of the date hereof or hereafter with respect to the WW Mark, including, without limitation, any claims for damages by reason of past, present or future infringement or other unauthorized use of the WW Mark, with the right to sue for, and collect the same for the Assignee's own use and enjoyment, and for the use and enjoyment of its successors and assigns.

Assignee or Assignor, on request of Assignee, shall record this assignment with the Trademark Office, by electronic filing of a Recordation Form Cover Sheet along with a copy of this assignment upon the date hereof.

{37255970;1}

**WORLDWIDE TRANSPORTATION
SERVICES, INC.**


By:_____
Name:
Title:


**WORLDWIDE INVESTMENT I, LLC**


By:_____
Name:
Title:


**WORLDWIDE INVESTMENT II, LLC**


By:_____
Name:
Title:


**WORLDWIDE INVESTMENT III, LLC**


By:_____
Name:
Title:

## Exhibit E

## Limited Power of Attorney

(see attached)



miamidade.gov

**Department Regulatory and Economic Enhancement**

Business Affairs

601 NW 1st Court 18th Floor

Miami, FL 33136

Phone 786.469.2314 Fax 786.469.2313

## Limited/General Power of Attorney Form

**Note:  It is required one form for each individual given power of attorney**

BE IT ACKNOWLEDGED, that I

_____ **of**
(Name & Title of Permit Holder)

_____, **the undersigned, do hereby grant** a
power              (Company if applicable)

**Of attorney to** _____, _____-_____-
_____,                         (Name)                          (Social Security #)

_____, ____/____/____, ( )_____-_____,
(Driver's License #)              (Date of Birth)       (Home phone #)       (Home
Address)

_____

( )_____-_____, _____, **as my attorney-in-fact.**
(Business phone #)      (Business Address)

( ) **General** said attorney in fact shall have full power and authority to undertake and perform
any and all acts on my behalf pertaining the operation of the following For-hire  License(s) and/or
Certificate(s) of Transportation : _____ .

( ) **Limited**  the attorney-in-fact shall have full power and authority to undertake and perform
only the following acts on my behalf and/or in the operation of the For-Hire License(s) and/or
Certificate(s) of Transportation No.(s)

_____ .

_____

_____

My attorney-in-fact agrees to accept this appointment subject to its terms and agrees to act and perform in
said fiduciary capacity consistent with my best interest as my attorney-in-fact in its discretion deems
advisable.  This power of attorney is effective upon execution and shall be valid for a period of time not to
exceed 11 months.  This power of attorney may be revoked by me at any time, and shall automatically be

revoked upon my death.  This power of attorney rescinds and/or revokes any and all prior power attorneys issued for the operation of the license(s) listed on this form.

Signed under seal this _____ day of _____, _____.

____

_____

Signature of Permit Holder)

Signed before me _____ on this _____ day of _____, _____. Witness my hand and official seal.

_____Affiant     known      _____     or      produced     ID

_____
            (Notary)

**(Seal)**

**Exhibit F**

**Bidding Procedures Motion**

(see attached)

## Exhibit G

### Bidding Procedures Order

(see attached)

**Exhibit H**

**Sale Order**

(see attached)

**Schedule Section 1(a)(iv)**

**Contracts**

Florida Service Agreements:

1.  Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and 3201 Hotel LLC dated November 1, 2015.

2.  Agreement for Limousine Services by and between Worldwide Transportation Services, Inc. and Ocean Reef Club, Inc. dated as of October 20, 2015.

3.  Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and MP Miami Hotel Owner DBA Four Seasons Hotel Miami dated October 15, 2015.

4.  Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and Acqualina Management, LLC, d/b/a Acqualina Resort & Spa on the Beach, Florida 33160 dated August 28, 2015.

5.  Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and Eden Roc LLLP, by Destination Miami Beach Management, LLC dated July 27, 2015.

6.  Transportation Services Agreement by and between Worldwide Transportation and The Ritz-Carlton Hotel Company, L.L.C. dated as of March 31, 2015.

7.  Transportation Services Agreement by and between Worldwide Transportation and The Ritz-Carlton Hotel Company, L.L.C., as Operator for GenMag Coconut Grove, LLC., d/b/a The Ritz-Carlton, Coconut Grove, dated as of March 10, 2015.

8.  Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and 2377 Collins Resort, L.P. dated February 17, 2015.

9.  Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and Quadrum Miami Beach LLC, DBA of Nautilus South Beach – a SIXTY Hotel, dated January 1, 2015.

10. Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and Seldar Miami Holding, LLC dated 2015.

{37255970;1}

11. Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and Sofitel Miami dated December 27, 2012.

12. Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and Trump International Beach Resort undated.

III. Georgia Service Agreement:

13. Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and SLC Atlanta LLC D/B/A The Westin Peachtree Plaza dated February 24, 2015.

IV. Illinois Service Agreements:

14. Property Agreement by and between HST WRN LLC dba Westin Chicago River North (Hotel) and Worldwide Transportation Services, Inc. dated as of May 1, 2015.

15. Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and The Conrad Hotel Chicago dated December 16, 2014.

16. Transportation Services Agreement by and between Worldwide Transportation Services, Inc. and LHO Michigan Avenue Freeze Out LLC dated 2014.

**Schedule Section 1(a)(v)**

**Permits**

# LIST OF PERMITS

Miami Dade County Leases

| License # | DBA Name | Account ID | Address | City | St | Lic Status |
|---|---|---|---|---|---|---|
| 10301.TMP-PB | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 60007.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60026.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 60043.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60044.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60064.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locks | FL | Active |
| 60079.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60092.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60101.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60103.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 60105.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60135.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locks | FL | Active |
| 60159.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 60160.LU | Worldwide Investment I, | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |

| License # | DBA Name | Account ID | Address | City | St | Lic Status |
|-----------|----------|-----------|---------|------|-----|-----------|
| | LLC | | | | | |
| 60163.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60167.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 60175.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60176.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60179.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60180.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locks | FL | Active |
| 60356.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locks | FL | Active |
| 60388.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60389.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60391.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60397.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 60404.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60420.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60426.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |

| License # | DBA Name | Account ID | Address | City | St | Lic Status |
|---|---|---|---|---|---|---|
| 60439.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 60444.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 60466.LU | Worldwide investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60489.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60490.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60502.LU | Worldwide Investments II, LLC | 250060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60526.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 60530.LU | Worldwide Investments II, LLC | 25D060 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 60532.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 61018.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 61022.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa. Locka | FL | Active |
| 61024.LU | Worldwide Investment I, LLC | 250056 | 15001 NW 42nd Ave | Opa Locka | FL | Active |
| 61042.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 61051.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 61062.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |

{37255970;1}

| License # | DBA Name | Account ID | Address | City | St | Lic Status |
|---|---|---|---|---|---|---|
| 61063.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 61064.LU | Worldwide Investment III, LLC | 250058 | 15001 NW 42nd Ave #47 | Opa Locka | FL | Active |
| 30148.PM | World Wide Limousine, Inc. | 121571 | 19006 SW 76th Ave | Cutler Bay | FL | Active |

Broward County Leases

| License # | DBA Name | Address | City | St |
|---|---|---|---|---|
| LS1359 | Worldwide Investments I LLC | 15001 NW 42nd Ave, Bldg. 47 | Miami | FL |
| LS1329 | Worldwide Investments I LLC | 15001 NW 42nd Ave, Bldg. 47 | Miami | FL |
| LS1289 | Worldwide Investments I LLC | 15001 NW 42nd Ave, Bldg. 47 | Miami | FL |
| LS1288 | Worldwide Investments I LLC | 15001 NW 42nd Ave, Bldg. 47 | Miami | FL |

## Schedule Section 1(a)(vi)

## List of Vehicles for Selection

| # | Veh # | Year | Make | Model | VIN # | Leasing Company | LEASE # |
|---|---|---|---|---|---|---|---|
| 1 | 26 | 2013 | Mercedes | Sprinter | WDZPE8CC2D5736445 | Advantage Funding | 4020-22472 |
| 2 | 28 | 2013 | Mercedes | Sprinter | WD3PE8CC0D5729347 | Advantage Funding | 4020-21890 |
| 3 | 29 | 2014 | Lincoln | MKT | 2L1MJ5LK4EBL51134 | Titus Leasing | 46707-7279 |
| 4 | 30 | 2014 | Lincoln | MKT | 2L1MJ5LK1EBL52855 | Wells Fargo Fleet Financing | 001-0388081-101 |
| 5 | 31 | 2014 | Lincoln | MKT | 2L1MJ5LK9EBL52862 | Titus Leasing | 46707-7348 |
| 6 | 32 | 2015 | Cadillac | EVS 185" Limousine | 1GYS3GKJ2FR246092 | Wells Fargo Fleet Financing | 001-0388081-102 |
| 7 | 38 | 2015 | FORD | F650 | 3FRPF6FE6FV675292 | Signature Financing | 103-360007 |
| 8 | 39 | 2015 | Ford | F650 | 3FRPFYFE9FV567832 | TCF Equipment finance | 003-0662908-100 |
| 9 | 41 | 2007 | Krystal | Minibus | 1HVBTAANX7H426297 | Union Leasing | 64822 HQ |
| 10 | 42 | 2008 | Krystal | Minibus | 1HVBTAAN48H666933 | Union Leasing | 64823 HQ |
| 11 | 43 | 2013 | FORD | F550 GM | 1FDGF5GT5DEB15417 | Santander Bank | 002-0014810-000 |
| 12 | 44 | 2008 | Krystal | Minibus | 1HVBTAAN28H666932 | Union Leasing | 64824 HQ |
| 13 | 45 | 2008 | Krystal | Minibus | 1FDAF56R98EC54080 | Union Leasing | 64826 HQ |
| 14 | 46 | 2013 | FORD | F550 GRECH | 1FDUF5GT1DEA42517 | Advantage Funding | 4020-23797 |
| 15 | 47 | 2013 | FORD | F550 GRECH | 1FDGF5GT3DEB15433 | Santander Bank | 002-0014810-000 |
| 16 | 48 | 2013 | FORD | F550 GM | 1FDGF5GT6DEB15412 | Santander Bank | 002-0014810-001 |
| 17 | 49 | 2013 | FORD | F650 GM | 3FRPF6FE2DV774981 | Advantage Funding | 4020-27378 |
| 18 | 50 | 2015 | FORD | F650 | 3FRPF6FE7FV568011 | TCF Equipment finance | 003-0662908-101 |
| 19 | 55 | 2013 | Mercedes | Sprinter | WDZPE8CC1D5730884 | Advantage Funding | 4020-23800 |
| 20 | 56 | 2010 | Mercedes | Sprinter | WDZPE8CC7A5469210 | Advantage Funding | 4020-16566 |
| 21 | 57 | 2012 | Mercedes | Sprinter | WDZPE8CC1C5634686 | Advantage Funding | 4020-18436 |
| 22 | 58 | 2012 | Mercedes | Sprinter | WDZPE8CC1C5667588 | Advantage Funding | 4020-18539 |
| 23 | 59 | 2013 | Mercedes | Sprinter | WDZPE8CCXD5730883 | Advantage Funding | 4020-21632 |
| 24 | 60 | 2013 | Mercedes | Sprinter | WDZPE8CC1D5730352 | Advantage Funding | 4020-21559 |

{37255970;1}

| # | Veh # | Year | Make | Model | VIN # | Leasing Company | LEASE # |
|---|---|---|---|---|---|---|---|
| 25 | 62 | 2013 | Mercedes | Sprinter | WDZPE7CC9D5752738 | Advantage Funding | 702-24360 |
| 26 | 74 | 2014 | Mercedes | E350 | WDDHF5KB3EA778314 | Advantage Funding | 702-24362 |
| 27 | 75 | 2014 | Mercedes | E350 | WDDHF5KB1EA810659 | Signature Financing | 103-360002 |
| 28 | 76 | 2015 | Mercedes | E350W | WDDHF5KB0FB095305 | Advantage Funding | 4020-32739 |
| 29 | 87 | 2015 | Cadillac | Escalade | 1GYS3HKJ1FR308376 | Union Leasing | 65454 |
| 31 | 95 | 2014 | TESLA | MODEL S | 5YJSA1S13EFP59560 | Advantage Funding | 4020-33901 |
| 32 | 96 | 2014 | LANDROVER | SPORT | SALWR2WF1EA385358 | Advantage Funding | 4020-31294 |
| 33 | 97 | 2013 | TESLA | MODEL S | 5YJSA1DPXDFP12770 | Advantage Funding | 702-27889 |
| 34 | 98 | 2013 | TESLA | MODEL S | 5YJSA1DPXDFP15412 | Advantage Funding | 4020-26549 |
| 35 | 99 | 2014 | MASSERATI | QUATTROPORTE | ZAM56RRA4E1076578 | Advantage Funding | 4020-24716 |
| 36 | 100 | 2011 | BENTLEY | FLYING SPUR | SCBBR9ZA1BC067662 | Advantage Funding | 4020-35391 |
| 37 | 101 | 2013 | AUDI | A8L | WAURVAFD7CN036829 | Advantage Funding | 4020-21280 |
| 38 | 112 | 2015 | Cadillac | XTS | 2G61U5S35F9131164 | National Leasing Services LLC | 1365 |
| 39 | 113 | 2015 | Cadillac | XTS | 2G61U5S34F9139840 | Marc Motors Inc | 2G61U5S34F9139840 |
| 40 | 114 | 2015 | Cadillac | XTS | 2G61U5S39F9132088 | National Leasing Services LLC | 1366 |
| 41 | 133 | 2015 | Cadillac | XTS | 2G61U5S33F9162073 | National Leasing Services LLC | 1367 |
| 42 | 141 | 2015 | Cadillac | XTS | 2G61U5S35F9162141 | Marc Motors Inc | 2G61U5S35F9162141 |
| 43 | 149 | 2015 | Cadillac | XTS | 2G61U5S30F9161768 | National Leasing Services LLC | 1368 |
| 44 | 151 | 2015 | Cadillac | XTS | 2G61U5S31F9143621 | National Leasing Services LLC | 1328 |
| 45 | 152 | 2015 | Cadillac | XTS | 2G61U5S35F9134534 | Marc Motors Inc | 2G61U5S35F9134534 |
| 46 | 155 | 2015 | Cadillac | XTS | 2G61U5S3XF9144380 | National Leasing Services | 1369 |

| # | Veh # | Year | Make | Model | VIN # | Leasing Company | LEASE # |
|---|---|---|---|---|---|---|---|
| | | | | | | LLC | |
| 47 | 167 | 2015 | Cadillac | XTS | 2G61U5S38F9140361 | Advantage Funding | 4020-34932 |
| 48 | 327 | 2015 | Chevrolet | Suburban | 1GNSKJKC2FR511110 | National Leasing Services LLC | 1329 |
| 49 | 328 | 2015 | Chevrolet | Suburban | 1GNSKJKC1FR537276 | Advantage Funding | 4020-34932 |
| 50 | 400 | 2015 | Cadillac | Escalade | 1GYS3SKJXFR525731 | National Leasing Services LLC | 1355 |
| 51 | 401 | 2015 | Cadillac | Escalade | 1GYS3SKJ1FR527934 | National Leasing Services LLC | 1370 |
| 52 | 402 | 2015 | Cadillac | Escalade | 1GYS3HKJ4FR295770 | National Leasing Services LLC | 1356 |
| 53 | 403 | 2015 | Cadillac | Escalade | 1GYS3HKJXFR297412 | National Leasing Services LLC | 1327 |
| 54 | 405 | 2015 | Cadillac | Escalade | 1GYS3HKJ7FR296170 | National Leasing Services LLC | 1354 |
| 55 | 406 | 2015 | Cadillac | Escalade | 1GYS3HKJ9FR297384 | Advantage Funding | 4020-36237 |
| 56 | 407 | 2015 | Cadillac | Escalade | 1GYS3HKJ8FR295321 | National Leasing Services LLC | 1358 |
| 57 | 408 | 2015 | Cadillac | Escalade | 1GYS3HKJ8FR293519 | National Leasing Services LLC | 1357 |
| 58 | 410 | 2015 | Cadillac | Escalade | 1GYS3HKJ7FR295553 | Advantage Funding | 4020-36053 |
| 59 | 412 | 2015 | Cadillac | Escalade | 1GYS3HKJ2FR295752 | Advantage Funding | 4020-34932 |
| 60 | 413 | 2015 | Cadillac | Escalade | 1GYS3HKJ5FR294403 | National Leasing Services LLC | 1359 |
| 61 | 414 | 2015 | Cadillac | Escalade | 1GYS3HKJXFR528466 | National Leasing Services LLC | 1360 |
| 6 | 415 | 201 | Cadillac | Escalade | 1GYS3HKJ5FR2957 | National | 1361 |

| # | Veh # | Year | Make | Model | VIN # | Leasing Company | LEASE # |
|---|-------|------|------|-------|-------|-----------------|---------|
| 2 | | 5 | | | 62 | Leasing Services LLC | |
| 63 | 417 | 2015 | Cadillac | Escalade | 1GYS3HKJ4FR297504 | | |
| 64 | 418 | 2015 | Cadillac | Escalade | 1GYS3SKJ9FR530290 | National Leasing Services LLC | 1362 |
| 65 | 419 | 2015 | Cadillac | Escalade | 1GYS3SKJ6FR529047 | National Leasing Services LLC | 1364 |
| 66 | 420 | 2015 | Cadillac | Escalade | 1GYS3HKJXFR296003 | Union Leasing | 65440 HQ |
| 67 | MR8 | 2014 | Mercedes | S550 | WDDUG8CB8EA065646 | Advantage Funding | 4020-29617 |
| 68 | MR9 | 2014 | Mercedes | S550 | WDDUG8CB4EA012538 | Advantage Funding | 702-26739 |
| 69 | MR10 | 2014 | Mercedes | S550 | WDDUG8CB6EA013223 | Advantage Funding | 702-26668 |
| 70 | MR11 | 2014 | Mercedes | S550 | WDDUG8CB5EA042504 | Titus Leasing | 46707-7360 |
| 71 | MR2 | 2015 | Mercedes | S550 | WDDUG8CB4FA134754 | Advantage Funding | 4020-24716 |

**Schedule Section 4(j)(i)**

**Litigations**

## Litigations

- Martinez v. Worldwide Transportation Services Inc., et al., Case No. 15-cv-60727-WPD
- Shakhnis et al. v. Worldwide Transportation Services, Inc., et al., Case No. 1:15-cv-20909-JLK
- Misael Carrizo v. Worldwide Transportations Services, Inc., et al., Case No. 1:15-cv-22172-CMA
- Pavel Crus Tena v. Worldwide Transportation Services, Inc., Case No. 1:15-cv-23172-FAM
- Pedro C. Serritiello v. Worldwide Transportation Services, Inc., et al., Case No. 1:15-cv-24122-KMW
- Ean Sims and Curt Lake v. Worldwide Transportation Services, Inc., Case No. 1:15-cv-21857-KMW

**Schedule Section 4(k)**

**Plans**

## Plans

- Workers Compensation and Employers Liability Insurance Policy, Policy No WCP101493101GIC issued by Guarantee Insurance Company  for the period from December 6, 2015 to December 6, 2016.
- Small Group Achieve LS600 Health Car plan for Worldwide Transportation issued by AvMed, renewal date 02/01/2016

**Schedule Section 4(p)**

**Employees**

## Employees

- Armitage, Mavelyn
- Basnuevo, Giselle D
- Botero, Juliana
- Chatfield, Antonio A.
- Cox, Terry L.
- Cunillera, Linabel Q.
- Espronceda, Rosa H.
- Lugo, Juan L.
- Malek, Ali A.
- Maleki, Hamdam
- Martinez, Jesus
- Mayorga Prado, Guillermo I.
- Noil, Anthony M.
- Onate, Rodolfo
- Rovira, Cristen L.
- Sando, Wesner
- Santamaria, Banesa K.
- Thomas Joseph, Audra C.
- Urena, Saskia L.
- Vidal, Lillian M.